***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Plaintiff was employed by defendant-employer Charlotte Heating Air Conditioning (hereafter "Charlotte Heating Air") from 1960 through 1966.
2. Plaintiff was employed by defendant-employer Ross Witmer, Inc., (hereafter "Ross Witmer") from 1972 through 1975.
3. The parties are subject to the North Carolina Workers' Compensation Act since both defendant-employers employed the requisite number of employees to be bound under the provisions of said Act.
4. Defendant-employer Charlotte Heating Air was insured by Employers Mutual Casualty Company during all relevant periods of plaintiff's employment with Charlotte Heating Air.
5. Defendant-employer Ross Witmer was insured by Travelers Insurance Company during all relevant periods of plaintiff's employment with Ross Witmer.
6. Plaintiff made $32,052.00 in his last year of employment in 1989.
7. In addition, the parties stipulated into evidence the following:
 1. The documents attached to the Pre-Trial Agreement, including medical records from Drs. Pamela Culp, Bruce Fee, Tommy L. Weaver, Stephen Proctor, Frederick M. Dula, Richard Bernstein, Larry Maugel and Selwyn Spangenthal.
 2. Additional medical records submitted 3 July 2001 from Dr. Bernstein.
 3. Subsequent to the hearing before the Deputy Commissioner, Deputy Commissioner Chapman issued an Order dated 11 June 2001 accepting into evidence the death certificate of decedent Payne.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Herby S. Payne was 64 years old on the date of hearing before the Deputy Commissioner on 3 May 2000. He subsequently died on 16 October 2000. He began working for defendant Charlotte Heating Air Conditioning (Charlotte Heating) in 1960. After a training period, he was assigned to do primarily service work, which he did alone. Service work included repairing boilers where plaintiff would go inside the boiler and replace ceramic fire brick using "asbestos mud" to hold it in place. Decedent mixed the asbestos mud by emptying a bag of dry powder into a five gallon bucket and adding water. When opening a bag of dry powder and pouring it into the bucket, decedent was exposed to airborne dust particles of asbestos. Decedent also used the mud to insulate elbows in the steam pipes coming out of the boiler where the fiberglass insulation would not fit. Asbestos roping was used to seal the door of the boiler and he would cut it to the proper length.
2. While working for Charlotte Heating, decedent spent 75% of his working hours servicing or installing oil furnaces. Servicing existing furnaces did not normally require applying asbestos insulation or disturbing the insulation previously installed. However, installation work often did and decedent installed new furnaces between one and ten times per month. When oil furnaces were installed in a crawl space under a house, there was often insufficient clearance between the furnace and the floor joist in order to meet building code requirements. Consequently, a piece of asbestos millboard was placed in that space. Decedent would have to cut the board to the correct size in those instances. When decedent cut boards of insulation, he was exposed to airborne particles of asbestos dust. Decedent also put asbestos mud around flue pipes if there were no concrete on his truck, again exposing himself to airborne asbestos dust while mixing the mud.
3. Although decedent primarily performed service work, he was assigned to work on a large project for approximately three months during the period of his employment with Charlotte Heating. The company obtained a contract to build tables and large ovens for a textile dyeing operation. Decedent installed much of the insulation for the ovens and used asbestos millboard and mud in the process. In so doing, decedent was exposed to asbestos dust while mixing the mud from dry asbestos powder. There was also airborne asbestos dust associated with sawing the asbestos millboard to use on the inside or outside of the framework of the ovens. It took approximately two months to complete the insulation process.
4. Decedent was never provided and never used any form of respiratory protection during his employment with Charlotte Heating. He worked for the company until 1966 when he left to go work for another heating and air conditioning company. After working for other companies in jobs which did not involve much exposure to asbestos products, he began working for defendant Ross Witmer in 1972. Most of his work for Ross 
Witmer involved fabricating ductwork from sheet metal and then installing it, although he did set some furnaces, as well.
5. Ross Witmer was hired to install the furnaces in a new apartment complex being built in Charlotte which consisted of approximately 160 to 170 units. The furnace for each unit was placed inside a closet. Since the closets were so small that there was an inadequate clearance to meet building codes, asbestos millboard had to be attached to three walls of each closet for fire protection. The workers also used asbestos cloth on a section of the system between the furnace and the door. Decedent was the supervisor for the crew and showed them how to cut and apply the asbestos millboard and how to perform the rest of the installation. When cutting asbestos millboard, decedent was exposed to airborne asbestos dust. After showing the crew how to cut and install the millboard, decedent would go back and forth between the shop and the apartment complex, taking measurements for ductwork at the next unit, fabricating the ductwork at the shop and then returning to the apartment to install the ductwork. While measuring and installing ductwork, he would be in the vicinity of the crew who were cutting and applying asbestos millboard and cloth. While in the vicinity of the crew, decedent was exposed to airborne asbestos dust. Decedent would work at the apartment complex two to four times per week during the project, which lasted over six months. No respiratory protection was provided to the workers.
6. Decedent stopped working for Ross Witmer in 1975 and subsequently worked for a number of different employers, or as a self-employed car mechanic, until 1985 when he started an electrostatic painting business. To his knowledge, decedent was not exposed to asbestos products to any significant degree after he left Ross Witmer. In 1989 he developed back problems which lead to fusion surgery. Despite the operation, decedent remained symptomatic and went on Social Security disability. Decedent did not thereafter return to the workforce.
7. Decedent testified at the hearing before the Deputy Commissioner that his back symptoms were no longer keeping him out of work, but was unable to provide a date at which he believed he was no longer disabled as a result of his back problems. Decedent's wife testified at the hearing before the Deputy Commissioner that decedent was no longer disabled approximately 18 months after his 1989 back surgery. Decedent underwent a second back surgery for a slipped disk in late 1997.
8. Decedent smoked one to two packs of cigarettes per day for at least thirty years until 1993 when he quit.
9. On 21 January 1994, decedent saw Dr. Spangenthal, a pulmonologist, on referral from his family doctor. Decedent told Dr. Spangenthal that he had been short of breath for a few years at that point, but had become significantly worse for the previous year or two to the point that he was now short of breath with minor exertion. Decedent had just been discharged from the hospital where he had been treated for breathing problems, and he indicated that he had previously been treated for pneumonia. Decedent also noted that he had smoked one to two packs of cigarettes per day for approximately 30 years, but had quit approximately four months earlier. Pulmonary function studies indicated very severe obstructive lung disease. Since decedent reported problems with coughing, Dr. Spangenthal was of the impression that he had some chronic bronchitis. However, it became clear in subsequent follow-up that decedent had severe emphysema with marked air trapping. He was treated with medications.
10. On 5 January 1995, decedent had a chest x-ray. Dr. Bruce Fee, the radiologist who performed the examination, found "evidence of bilateral pleural plaquing with some calcifications compatible with asbestosis." He further noted "some linear density and stranding anteriorly, especially on the right, which may relate to atelectasis and/or fibrosis." Dr. Fee recommended that a series of films be made over a period of months for comparison.
11. Decedent subsequently underwent further x-rays, a regular CT scan and a high resolution CT scan which have been reviewed and interpreted by several different radiologists. Dr. Pamela Culp, a radiologist, examined the later high resolution CT and compared it with the 1995 CT. She concluded that there was no acute or progressive change since the earlier CT, and noted "bilateral pleural thickening with some calcification again suggestive of asbestos exposure. There are changes consistent with chronic interstitial lung disease and probable emphysematous COPD with bilateral interstitial thickening/scarring." On 30 April 1998, Dr. Culp compared a new CT to the one taken in November 1997. She noted changes of chronic interstitial lung disease with "persistent patchy interstitial scarring and persistent pleural thickening and calcification changes of asbestos exposure."
12. Dr. Stephen D. Proctor, a specialist in pulmonary medicine, examined decedent on 19 August 1999. At that time, decedent reported to Dr. Proctor that he experienced dyspnea upon "almost any exertion, such as walking from one room to another." He further reported wheezing, cough productive of clear sputum and occasional orthopnea. Decedent was using a wheelchair and oxygen. Dr. Proctor reviewed decedent's pulmonary function tests and radiographic studies. Decedent's chest x-ray showed "severe emphysematous changes, bilateral pleural plaque formation, a small left diaphragmatic plaque, increased density in the right hilar area and degenerative changes in the spine." Decedent's chest CT showed "severe emphysematous changes, coronary artery calcification, bilateral increased interstitial markings and extensive bilateral pleural plaque formation." Based upon the examination, decedent's history and the pulmonary function tests, Dr. Proctor diagnosed decedent with emphysema and "asbestosis and pleural plaques related to asbestos exposure."
13. Dr. Fred Dula, a NIOSH certified B-reader with Piedmont Radiological Associates in Salisbury, N.C., examined decedent's chest films dated 22 February 1998. Dr. Dula noted "a left-sided diaphragmatic plaque" and "mild pleural thickening and plaque formation bilaterally." Dr. Dula's impression was that his findings were "entirely consistent with asbestosis."
14. Dr. Richard Bernstein, a NIOSH certified B-reader with Pulmonary Critical Care Medicine, examined decedent's x-rays dated 30 February 1999 and found "severe bullous disease with possible parenchymal changes in the bases. Pleural disease consistent with long standing asbestos exposure."
15. The deposition testimony of Dr. Michael S. Alexander, a diagnostic radiographic expert and certified B-reader, was taken on 31 August 2001. On 20 March 2001, Dr. Alexander examined a high resolution chest CT taken on 30 July 1999 and found "bilateral partially calcified circumscribed chest wall pleural plaques . . . along the anterior and posterior chest wall pleural surfaces." Dr. Alexander concluded that decedent had "asbestos disease of the pleura, but insufficient evidence of pulmonary asbestosis." Dr. Alexander further commented that decedent had "stable asbestos-related pleural disease and chronic scarring in the anterior mid lung zones," but that "any pulmonary impairment or dysfunction is almost certainly caused by the extensive emphysema. Even if the localized interstitial abnormalities were in part caused by asbestosis, they probably would not contribute to [decedent's] pulmonary impairment in view of the extensive emphysema which is present." Given that Dr. Alexander is not a pulmonologist, did not examine plaintiff personally and is not a diagnosing physician, the Full Commission gives greater weight to the diagnostic conclusions of Dr. Proctor and the x-ray and CT interpretations of Drs. Dula and Bernstein.
16. Decedent died on 16 October 2000. The Certificate of Death filed on 19 October 2000 states the causes of death as emphysema and pulmonary fibrosis.
17. Decedent suffered from the occupational disease asbestosis as a direct result of his work-related exposure to the hazards of asbestos for 30 working days or parts thereof, within seven consecutive calendar months while employed with Charlotte Heating Air Conditioning and with Ross Witmer, Inc. Decedent's last injurious exposure to asbestos occurred during his employment with defendant-employer Ross Witmer.
18. Decedent's asbestosis combined with other pulmonary conditions resulted in severe pulmonary impairment which resulted in his total disability from employment from 19 August 1999, the date he was diagnosed with asbestosis by Dr. Proctor, until 16 October 2000, the date of his death.
19. Decedent's asbestosis either caused or significantly contributed to the material aggravation of his severe pulmonary condition which in turn significantly contributed to his death.
20. Plaintiff made $32,052.00 in his last year of employment in 1989.
21. Defendants' defense of decedent's claim was not unreasonable and plaintiff is not entitled to receive an award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Decedent contracted the occupational disease of asbestosis and asbestos related pleural plaques as a result of his asbestos exposure during his employments with defendant-employers. N.C. Gen. Stat. §§ 97-53(24); 97-62.
2. Decedent's last injurious exposure to asbestos occurred during his employment with defendant-employer Ross Witmer; therefore, defendant-employer Ross Witmer and defendant Carrier Traveler's Insurance Company are liable for decedent's claim. N.C. Gen. Stat. §97-57; Cain v. Guyton, 79 N.C. App. 696, 340 S.E.2d 501 (1986).
3. Decedent became totally disabled as a result of his occupational disease of asbestosis and asbestos related pleural plaques by the time of his diagnosis by Dr. Proctor on 19 October 1999. Decedent's total disability continued until the date of his death on 16 October 2000. Decedent is eligible for total disability compensation at the rate of $410.94 per week from 19 October 1999 through 16 October 2000. N.C. Gen. Stat. §§ 97-29; 97-61.6.
5. Decedent died while he was entitled to total compensation for disablement due to asbestosis; therefore, plaintiff is entitled to compensatory death benefits in the amount of $410.94 per week for a total of 400 weeks, or $164,376.00. Plaintiff is entitled to an additional $3,500.00 in burial expenses. N.C. Gen. Stat. §§ 97-38; 97-61.6.
6. Plaintiff is the widow of decedent and is entitled to death benefits under N.C. Gen. Stat. § 97-39.
7. Plaintiff is entitled to payment by liable defendants of all medical expenses related to the treatment of decedent's occupational disease of asbestosis. N.C. Gen. Stat. § 97-25.
8. Defendants have not defended decedent's claim unreasonably; therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants Ross Witmer and Traveler's Insurance Company shall pay to plaintiff total disability compensation in the amount of $410.94 per week from 19 October 1999 through 16 October 2000. This amount shall be paid in a lump sum, subject to attorney's fees approved below.
2. Defendants Ross Witmer and Traveler's Insurance Company shall pay to plaintiff the amount of $410.94 per week for a period of 400 weeks, beginning on 16 October 2000. That portion of the award which has accrued shall be paid in a lump sum, subject to attorney's fees.
3. Defendants Ross Witmer and Traveler's Insurance Company shall pay to plaintiff any medical expenses related to the treatment of decedent's occupational disease of asbestosis.
4. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of the amounts awarded in Paragraphs 1 and 2 herein. Defendants Ross Witmer and Traveler's Insurance Company shall pay directly to plaintiff's counsel one fourth of the lump sum payments awarded above. Thereafter, defendants shall pay to plaintiff's counsel every fourth check.
5. Plaintiff's claim for attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1 is hereby denied.
6. Defendants Ross Witmer and Traveler's Insurance Company shall pay the costs of this action.
This the ___ day of March, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER